# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

ORIN K. KELLY,               )
)
       Plaintiff,          )
)
       v.                )      Case No. 08-1052
)
ILLINOIS CENTRAL RAILROAD COMPANY  )
d/b/a CANADIAN NATIONAL/ILLINOIS  )
CENTRAL RAILROAD COMPANY,    )
)
       Defendant.      )

# O R D E R

This matter is now before the Court on Defendant's Motions for Summary Judgment and Motions to Bar Expert Testimony.  For the reasons set forth below, the Motion for Summary Judgment on the Statute of Limitations [#17] is DENIED.  The Motion for Partial Summary Judgment Regarding Ballast Claims [#20] is DENIED.  The Motion to Bar the Expert Opinion Testimony of Tyler Kress [#29] is DENIED.  The Motion to Bar Plaintiff's Treating Physicians From Giving Expert Causation Opinions [#18] is GRANTED with leave to seek reconsideration after an adequate offer of proof, and the Motion for Summary Judgment for Lack of Causation Evidence [#40] is DENIED.  The Motion for Partial Summary Judgment on Plaintiff's Allegations Regarding Locomotive Seats [#38] is DENIED.

## BACKGROUND

Since 1971, Plaintiff, Orin Kelly ("Kelly"), has been employed by Defendant, Illinois Central Railroad Company ("Illinois Central"), as a conductor/trainman.  On February 19, 2008, Kelly filed his Complaint in this matter, alleging work related injuries to his back,

neck, knees, and adjacent structures. Count I asserts a claim against Illinois Central, under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.* Count II is a claim for Negligence Per Se, and Count III alleges violations of the Locomotive Inspection Act. Illinois Central has moved for summary judgment on numerous grounds. The motions are fully briefed, and this Order follows.

## STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the

[non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

**ANALYSIS**

**I. Statute of Limitations**

FELA provides in relevant part that "[e]very common carrier by railroad while engaging in [interstate] commerce . . . shall be liable to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the [carrier's] negligence." 45 U.S.C. § 51. FELA was enacted as a "broad remedial statute" to respond "to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety." Sinkler v. Missouri Pacific R.R. Co., 356 U.S. 326, 329 (1958). The Act is meant to be read liberally in favor of injured railroad employees. Urie v. Thompson, 337 U.S. 163, 180 (1949).

Illinois Central moves for summary judgment based on FELA's statute of limitations. Under FELA, "no action shall be maintained under this [A]ct unless commenced within three (3) years from the day the cause of action accrued." 45 U.S.C. § 56. The cause of action accrues for statute of limitations purposes "when a reasonable person knows or in the exercise of reasonable diligence should have known of both the injury and its governing cause." Green v. CSX Transportation, Inc., 414 F.3d 758, 763 (7th Cir. 2005), *citing* Tolston v. National R.R. Passenger Corp., 102 F.3d 863, 865 (7th Cir. 1996); Fries v. Chicago & Northwestern Transportation Co., 909 F.2d 1092, 1095 (7th Cir. 1990). Where

"an injury results from continual exposure to a harmful condition over a period of time, a plaintiff's cause of action accrues when the injury manifests itself." Id.; Fries, 909 F.2d at 1094. Accordingly, for purposes of this case, the issue is whether Kelly knew or had reason to know through the exercise of reasonable diligence that he had suffered an injury as a result of his work on the railroad prior to February 19, 2005.

Kelly claims injuries to his neck, back, and both knees. Unlike the situation in Green, Kelly sought treatment for his pain on more than one occasion, and there are more than a few stray references to generalized pain in Kelly's medical records. In December 1991, he was treated by Dr. James Harms for complaints related to his lumbar spine. Kelly indicated that he had been seeing a chiropractor for his back, and they discussed the nature of Kelly's work at that time. Dr. Harms suggested that he consider finding a job that was less physical but never specifically told him that if he continued to work as a switchman on a day to day basis that he would sustain additional injury to his back.

Kelly began treatment at the Clinton Chiropractic Center for low back and neck complaints in January 1998 and continued to receive treatment there at least through January 2009. He received treatment 58 times in 1998, 9 times in 1999, 9 times in 2000, 13 times in 2001, 8 times in 2002, 12 times in 2003, 9 times in 2004, and 40 times in 2005 (7 of which occurred prior to February 18, 2005), for a total of 125 chiropractic treatments prior to the three-year limitations period in this case.

Kelly told his treating physicians about his job duties, including that he had to jump on and off trains. He further admits that back in the 1990's, his treating doctors told him that getting on and off trains was a contributing factor to his neck and back pain. However, he denies that he knew or should have known that his railroad work was causing

appreciable injury to his neck and back until degenerative cervical and lumbar disc disease was specifically diagnosed by Dr. George Schoedinger on August 22, 2006. An MRI subsequently showed posterior disc protrusions from L3 to S1 and extradural defects at C3-4, C5-6, and C6-7 consistent with ruptured discs at these levels.

At some point, Kelly also began to experience pain in both of his knees. Although he is unable to specifically recall when this began, he knows that it was after his union signed a contract that called for ten-hour workdays. The record indicates that the contract increasing the basic work day to ten hours became effective on July 28, 2003. He attributed his knee pain to the long hours of work at the railroad, as well as the conditions of the walk ways he had to work on, oversized ballast, mud, ice, snow, and tugging on switches. Kelly first obtained medical treatment for his knee pain from Dr. Forbes McMullin on September 12, 2006. He informed Dr. McMullin that he had been experiencing bilateral knee pain for about a year and that multiple bouts of mild knee pain had resolved themselves over the years. MRIs of his knees in 2006 showed degenerative patellofemoral compartment disease that ultimately required surgery.

Kelly cites periodic medical examinations in 2000 and 2005 in which he was deemed physically able to work as a conductor without restrictions and insists that his pain did not cause him to miss work. However, this misses the point. The question is not whether Kelly's condition rendered him physically unable to work as a conductor, but rather whether a reasonable person in his position should have realized that he had suffered more than a de minimus cumulative injury to his neck, back, and knees as a result of his work. Green, 414 F.3d at 764-65.

Likewise, Kelly states that none of his treating physicians ever told him that he had sustained injuries to his neck, back, or knees that were causally related to his railroad employment prior to February 19, 2005. He maintains that his chronic pain is something different from his ultimate injury and argues, without citation to any legal support, that such symptoms are insufficient to start the 3-year limitations clock running. Nevertheless, a plaintiff need not have actual knowledge of the injury by a confirming medical diagnosis in order for the claim to accrue. Fries, 909 F.2d at 1097. "The key is knowledge of the injury and, by extension, knowledge of the cause of that injury; it does not matter whether the plaintiff realizes that a legal wrong has occurred." Tolston v. National R.R. Passenger Corp., 1996 WL 467660, at *2 (7th Cir. Aug. 14, 1996).

> [T]he *Fries* court summarized the rule for FELA cases as follows: "a cause of action accrues for statute of limitations purposes when a reasonable person knows or in the exercise of reasonable diligence should have known of both the injury and its governing cause." Both components, the court emphasized, require "an objective inquiry into when the plaintiff knew or should have known, in the exercise of reasonable diligence, the essential facts of injury and cause. A plaintiff need not be sure which cause is predominant, as long as [he] knows or has reason to know of a potential cause. Just to be clear, the court added that this rule imposes on plaintiffs the affirmative duty to investigate the cause of a known injury.

Id.

Like the plaintiff in Tolston, Kelly believed that his pains were due to the ordinary wear and tear of old age. However, the record clearly indicates that he had been told as early as 1991 that his neck and back pain could be due to the physical nature of his work and that back in the 1990s, his treating physicians told him that getting on and off trains in the course of his work was a contributing factor to his neck and back pain. To suggest that

he needed a physician to go beyond this and specifically opine that his work was causing a specifically diagnosed injury to his neck and back in order to cause his claim to accrue is equivalent to demanding an actual knowledge standard that is not required by the law. Id. "At some point, persons with degenerative conditions have a duty to investigate cause." Id., citing Aparicio v. Norfolk & Western Ry. Co., 84 F.3d 803, 814-15 (6th Cir. 1996).

By his own admission, Kelly suffered from back and neck pain that required chiropractic treatment since the 1990s. In fact, his pain required an average of at least one treatment a week in 1998, when he received 58 treatments at the Clinton Chiropractic Center. That being said, prior to 1998 and from 1999 through 2004, he only received treatment on an average of once a month. The parties have not directed the Court to any evidence indicating that Kelly's pain was of sufficient magnitude to cause him to miss work or not be able to perform his duties, and Kelly described his pain as merely a "stiffness" that had bothered him off and on for years. (Kelly Dep., at 18) Kelly also stated that while he knew what his job duties were and knew that he was experiencing problems with his back and neck, he "didn't know what caused it at the time." Id., at 34-35.

Like the plaintiff in Tolston and Fries, Kelly knew he had a problem with his persistent stiffness, and like the plaintiff in Tolston, he was actively seeking treatment for it. However, unlike the plaintiff in Tolston, the treatment was very conservative. There is no indication that the pain was "extreme," required prescribed medication or even Ibuprofen for that matter, or caused him to miss any work prior to the three-year limitations period. In fact, he didn't even consider it worth discussing with his regular family doctor. (Kelly Dep., at 50) Additionally, the plaintiff in Tolston had been advised by her physicians that she had an actual injury separate and apart from "old age," in that she was told that

she had torn cartilage in her knee that would require surgery and that she was suffering from degenerative joint disease.

Given the necessity of his regular chiropractic treatment, as well as the statements from his treating physicians that his work was likely a contributing factor to his neck and back pain, a reasonable person in Kelly's position may have realized that some further investigation into the potential causes of his condition was required prior to February 19, 2005. However, this conclusion is not the only reasonable conclusion that could be drawn from this record. The intermittent nature of his pain does not appear to be on the same scale as that suffered by the plaintiffs in Tolston and Fries, and may not have been of sufficient magnitude to put a reasonable person in his position on notice that his work had caused a cognizable, cumulative injury to his neck and back.

Accordingly, when all disputed facts and reasonable inference are drawn in his favor, Kelly has by the barest of margins demonstrated a genuine issue of material fact as to whether he reasonably should have known of his injury and that it was caused by his work for the railroad prior to February 19, 2005, that requires resolution at trial. While his ability to succeed at trial is far from clear, the entry of summary judgment on this claim would be inappropriate. That being said, if the evidence presented at trial indicates that Kelly reasonably should have known of his injury prior to the statute of limitations, the Court will not hesitate to grant a directed verdict.

The existence of a genuine issue of material fact is even more apparent with respect to his bilateral knee injuries, where the record indicates only that he began experiencing pain after the union switched to a ten-hour work day in July 2003 and that Kelly associated his pain with that event. There is no indication that his pain cause him to miss work or was

of such magnitude that he sought treatment for his knee pain until 2006, well within the statute of limitations. The parties have cited no evidence establishing that prior to February 19, 2005, Kelly's knee pain was anything more than the kind of intermittent annoyance found to be equivalent to a "scratch" in <u>Green</u> and insufficient to constitute the accrual of a cumulative knee injury. Thus, when construed in the light most favorable to the plaintiff, the Court finds a genuine issue of material fact as to whether his knee pain was sufficient to put a reasonable person in Kelly's circumstances on notice that he had suffered a cognizable work-related injury to his knees. He is entitled to have a jury decide whether and when a reasonable person would have realized that he suffered more than a de minimus cumulative injury to his knees as a result of his work as a conductor. Illinois Centra's Motion for Summary Judgment must be denied in this respect.

## II.   <u>Ballast Claims</u>

Illinois Central next moves for summary judgment on Kelly's claims based on its alleged failure to properly inspect, maintain, or tamp the ballast. Specifically, Kelly alleges that his injuries were caused in part by walking on large, oversized road ballast that was dumped in the yards. Ballast is the gravel or crushed rock that is used to construct one or more layers above the subgrade to support the railroad track or provide drainage. Illinois Central argues that any claim with respect to the ballast is preempted by the Federal Railroad Safety Act ("FRSA"), which it contends "occupies the field" in this area.

The FRSA was enacted to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Under the FRSA, "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). Accordingly, it is clear that provisions of

the FRSA may sometimes preclude certain claims brought by railroad employees. Waymire v. Norfolk & Western Ry. Co., 218 F.3d 773, 777 (7th Cir. 2000).

The Federal Railroad Administration ("FRA") is responsible for promulgating and enforcing regulations under the FRSA. Where a railroad employer has followed the FRA regulation covering the subject matter of a claim, the FRSA has generally been held to preclude a FELA claim. Norfolk S. Rwy. Co. V. Shanklin, 529 U.S. 344 (2000). State law negligence claims are therefore preempted if a FRSA regulation "covers" or "substantially subsume[s]" the subject matter of the claim. CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993). The question here then is whether FRA regulations cover or substantially subsume the subject matter of the ballast claims asserted.

Illinois Central relies on Nickels v. Grand Trunk Western R.R., Inc., 560 F.3d 426 (6th Cir. 2009), and Norris v. Central of Georgia R.R. Co., 635 S.E.2d 179 (Ga.App. 2006), for the proposition that FELA negligence actions cannot be used to impose duties on railroads regarding ballast beyond those imposed by Congress or the FRA. Also cited are district court opinions from Michigan and the Indiana Court of Appeals. This authority is non-binding on this Court, and noticeably absent from Illinois Central's brief is any discussion of Taylor v. Illinois Central R.R. Co., 8 F.3d 584 (7th Cir. 1993), a case from this circuit which is binding on this Court.

In Taylor, a conductor claimed injury based on the railroad's failure to use yard ballast, which apparently consists of rocks with a smaller diameter, in the area around the tracks. Id., at 585. The plaintiff argued that smaller ballast would have provided a safer and more stable footing than the large ballast used. Id. While the main holding of the case addressed the admissibility of expert testimony on the issue of proper ballast size, and the

issue of preemption is not expressly addressed, the fact that such a claim went to trial and was affirmed on appeal implies that FELA claims based on ballast size are not necessarily preempted. *See* Hottenstein v. Burlington N. R.R.Co., 1998 WL 378429, at *4 (N.D.Ill. July 1, 1998); Grogg v. CSX Transportation, Inc., ___ F.Supp.2d ___, 2009 WL 2970380 (N.D.Ind. Sept. 14, 2009); Wilcox v. CSX Transp., Inc., 2007 WL 1576708, at *7 (N.D.Ind. May 30, 2007); Clark v. Illinois Central R.R. Co., Case No. 06-2025 (C.D.Ill. Oct. 4, 2007); Grimes v. Norfolk So. Rwy. Co., 116 F.Supp.2d 995 (N.D.Ind. 2000).

While there is definitely a split of authority on this issue, Illinois Central's argument urges the Court to find that the more recent decision of the Sixth Circuit in Nickels is more persuasive than existing law in this circuit. In Nickels, the plaintiffs alleged that they had suffered injuries as a result of walking on large mainline ballast instead of smaller yard ballast underneath and adjacent to tracks receiving heavy foot traffic. 560 F.3d at 428. The promulgated regulation regarding ballast is found at 49 C.F.R. § 213.103:

> Unless it is otherwise structurally supported, all track shall be supported by material which will – (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade; (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails; (c) Provide adequate drainage for the track; and (d) Maintain proper track crosslevel, surface, and alinement.

The Sixth Circuit found that this regulation made no distinction between mainline track and secondary, interior yard tracks, and that rather than prescribing certain ballast sizes for different types of track, "the regulation leaves the matter to the railroads' discretion so long as the ballast performs the enumerated support functions. In this way, the regulation substantially subsumes the issue of ballast size." Nickels, 560 F.3d at 431. Thus, the Sixth

Circuit focused on the question of ballast size in connection with supporting and providing drainage for the track itself, and did not appear to address claims regarding unsafe ballast size "in areas completely separate from those where track stability and support are concerned." Id., at 432. In fact, this distinction was expressly noted in Nickels, but was not resolved as the plaintiffs had not pled such a claim.

Here, Kelly takes issue with respect to ballast in connection with conditions in the railyard, which appears to be something different from the specific track support and drainage functions at issue in Nickels. *See* Davis v. Union Pacific R. Co., 598 F.Supp.2d 955, 959-60 (W.D.Ark. 2009) (finding that the issue of providing safe walkways is not covered by the regulation concerning ballast as the regulation is concerned with the track and the area immediately adjoining the track rather than the railroad yards.) The following passage from his deposition sheds some light on this question:

> Q.    What is your criticism of the railroad with regard to your conditions, if any?
>
> A.    I think we had oversized ballast that was supposed to be – we called it road ballast. It was supposed to be dumped out on the road. They dump it in the yards.
>
> * * *
>
> Q.    The things you're talking about are what I would call yard conditions?
>
> A.    Yes, yard conditions.

(Kelly Dep., at 81-83) His claim is also phrased in terms of failing to properly inspect or maintain the ballast or pathway, suggesting that the ballast in question was located on a pathway or walkway.

As it does not appear that Kelly's claims are limited to the ballast size in connection with supporting and providing drainage for the track itself, the Court finds that the established case law in this circuit, as set forth in the well-reasoned decisions in <u>Taylor</u>, <u>Hottenstein</u>, <u>Wilcox</u>, <u>Grimes</u>, <u>Clark</u>, and <u>Grogg</u> remains more compelling.  Section 213.103 is a subsection under Subpart D, which addresses "Track Structure," and does not on its face address ballast composition, size, or location in any capacity other than in the area immediately under and supporting the tracks to provide a safe roadbed for the trains; it simply does not address the use of ballast for other purposes or in other areas not immediately adjacent to the tracks.  This is a far cry from the comprehensive and specific regulations regarding the placement of warning devices at grade crossings or speed regulations that were found to cover the field in <u>Easterwood</u>, <u>Shanklin</u>, and <u>Waymire</u>.

As stated succinctly in <u>Grogg</u>:

> Once again, the plain language of § 213.103 does not state, expressly or by implication, that the regulation was intended to provide for the safety of railroad employees, or that it was promulgated by the FRA with a clear "intent to occupy the field of safety regulation of ballast completely" . . . .  The current "split of authority" on this issue is one that properly should be resolved by Congress and/or the FRA, by amending the language of § 213.103 to clarify its scope and intent.

___ F.Supp.2d ___, 2009 WL 2970380, at *17.  The Court therefore concludes that Kelly's ballast claims are not precluded by the FRSA, and Illinois Central's Motion for Partial Summary Judgment must be denied.

### III.    **Testimony of Tyler Kress**

Illinois Central next moves to exclude the expert report of Dr. Tyler Kress ("Kress"), an ergonomics expert, who is offered to testify regarding his review of all facts regarding

the injury and the mechanism of Kelly's injury. Illinois Central seeks the exclusion of Kress' expert report pursuant to Rule 26(a)(2)(B), which requires that an expert report contain: (1) a complete statement of all opinions the witness will express, as well as the basis and reasons for them; (2) the data or other information considered by the witness in forming them; (3) any exhibits that will be used to summarize or support them; (4) the witness' qualifications and a list of all publications authored during the previous 10 years; (5) a list of all other cases during the prior four years in which the witness testified as an expert at trial or by deposition; and (6) a statement of the compensation to be paid for the study and testimony.

Illinois Central maintains that Kress failed to disclose many of the specific bases for his opinions in his report. Kress admitted that his list of material reviewed, activities, and basis for his opinion does not include an exhaustive list of the testimony of co-workers that he has relied on, as the report lists the deposition testimony of Kelly and railroad employees who testified in other matters where he was an expert witness. He also relied on inspections at the Decatur and Clinton yards, including photos, which were not identified in his report. He further failed to provide a list of other cases in which he has testified as an expert witness. Accordingly, Illinois Central urges the Court to bar his expert report and go further to bar his testimony in its entirety as a sanction for his failure to disclose information pursuant to Rule 37(c)(1) and failure to supplement his report after being put on notice of the deficiencies.

Kelly responds that the foundation for Kress' opinions were adequately set forth in great detail in his June 10, 2009, report and were further explored during his deposition. Kress reviewed the case file, Kelly's personnel files and medical records, his deposition

testimony, the job description of a railroad conductor, Illinois Central's General Safety Rules, Operating Rules, L.I.F.E. Book, Transportation Safety Rules, and On-Track Safety Rules, reports from experts hired by Illinois Central in similar cases, personal visits to some of the areas where Kelly worked, his experience and evidence from other cases involving similar tasks and locations where Kelly worked, and relevant scientific literature. He also relied on his background, education, experience, and personal library, as well as his personal observations of conductors while performing the same time of work as that performed by Kelly.

Kelly acknowledges that Kress' report does not specifically list the names of other railroad workers from the other cases that he had worked on involving similar tasks and the same locations as this case, but this omission was cured eight days later during his deposition. The employees identified are well-known to defense counsel, who represented Illinois Central in each of their lawsuits and took their deposition testimony upon which Kress relies.

Kelly also acknowledges that he did not specifically identify his August 22, 2007, inspection of the Decatur and Clinton yards in his report as the specific inspection relied upon. However, his report noted that he had visited some of the areas where Kelly had worked, which gave some notice of the likely location of his inspection. Although the report did not identify the time frame of the inspection and a more precise identification should have been provided, this deficiency was again remedied shortly thereafter during Kress' deposition, where he produced documents and photos regarding his inspections at the Decatur and Clinton yards.

Finally, Kelly admits that his updated testimony list was not included with his report. However, he argues that the list was provided to counsel for Illinois Central on August 5, 2009, and in any event, Kress' testimony list is well known to defense counsel, who regularly represent Illinois Central in FELA cases and have deposed him on several similar cases where the list was produced as recently as February 2009.

While Kress' expert report was admittedly incomplete in the identified respects, the record indicates that the complained of deficiencies have been cured, and there is no significant prejudice to Illinois Central. The Court therefore declines the request to bar Kress' expert report and denies the Motion in this respect.

Illinois Central also challenges the admissibility of Kress' expert testimony. Illinois Central does not specifically challenge Kress' qualifications as an expert. Rather, it challenges his methodology and asserts that his conclusions are purely speculative.

Rule 702 governs the admissibility of expert testimony and provides in relevant part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of this case.

The Court's role in determining the admissibility of expert testimony is that of a gatekeeper. General Electric Co. v. Joiner, ___ U.S. ___, 118 S.Ct. 512, 517 (1997); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). In performing this role, the Court must determine whether the expert testimony in question meets two essential requirements: (1) it must be based on scientific, technical, or other specialized knowledge

and (2) it must assist the trier of fact in understanding the evidence or determining a fact in issue.  Daubert, 509 U.S. at 592; Fed. R. Evid. 702.  In other words, the opinion must be reliable and relevant.  Id., at 597.

Daubert provides a list of four factors to be considered in determining the soundness of the expert's methodology:

> (1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence.

Cummins v. Lyle Industries, 93 F.3d 362, 368 (7th Cir. 1996), citing Daubert, 509 U.S. at 594-95.  However, these factors are non-exclusive and do not constitute a definitive checklist.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  The key concern is that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Id., at 152.

Specifically, Illinois Central argues that Kress' methodology is flawed for the failure to offer any minimum threshold or level of the risk factors he identifies which would be sufficient to cause Kelly's alleged injuries.  The thrust of this argument is that since Kress did not conduct his own case-specific testing to Kelly's methods in performing his job while he was working or to quantify forces, exposures, impacts, and vibrations that Kelly was subjected to during his employment, his opinion in unreliable.  However, this argument if taken to its logical conclusion would require an expert to become involved and study how a plaintiff performed his job while still employed by the railroad, which is practically unworkable and, in many cases, would require an expert to become involved even before

a plaintiff becomes aware that they had suffered a permanent injury. The Court does not believe that <u>Daubert</u> requires this kind of result.

Unlike the experts in some of the cases cited by Illinois Central, Kress did interview Kelly, perform site inspections at the locations where Kelly worked, and personally observe the employment tasks being performed by conductors similar to those performed by Kelly during his employment. While these inspections and observations were done in connection with another similar case in 2007, there is nothing in the record before the Court indicating that the work sites or way the work was performed had changed in any significant manner in the year since Kelly stopped working for the railroad.[1] Accordingly, the Court finds that this fact goes to the weight to be given to the testimony, not its admissibility.

The inquiry under <u>Daubert</u> is not as rigid as Illinois Central would have the Court find. To the contrary, the inquiry as to reliability is necessarily "a flexible one" with the purpose of making certain that an expert, "whether basing testimony upon professional studies or personal experience employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire</u>, 526 U.S. at 152. As an expert, Kress can rely on his specialized knowledge, training, and experience. It is also completely appropriate for him to form opinions based on his knowledge, training, and experience after observing or studying the work of others rather than first hand participation or to rely on credible studies and reports by other professionals in reaching his conclusions. <u>Walker v. Soo Line R.R. Co.</u>, 208 F.3d 581, 588 (7th Cir. 2000); <u>Erickson v. Baxter</u>

_____

[1] This observation would appear to be confirmed by the fact that Illinois Central's proffered experts conducted their site inspections even later than Kress.

Healthcare, Inc., 151 F.Supp.2d 952, 964 (N.D.Ill. 2001), *citing* Wetherill v. University of Chicago, 565 F.Supp. 1553, 1563-64 (N.D.Ill. 1983).

Here, Kress' report indicates that he relied on peer-reviewed and scientific literature, as well as a 1993 report by the Long Island Rail Road based on a study titled "E.A.R.L.Y. IDENTIFICATION SYSTEM: Ergonomic/ADA Assessment of LIRR Trackworker Jobs," which analyzed the tasks performed by railroad workers and quantified the ergonomic risks involved in performing these tasks. The list attached to his report identifies numerous scholarly articles or studies addressing topics including ergonomics in the railroad industry, the use of claims data for surveillance of cumulative trauma disorder, cumulative trauma disorders in the workplace, application of biomechanical principles to reduce railroad injuries from physical exertion, ergonomic analysis of trackman/yard worker activities, research and recommended safety standards by the Association of American Railroads ("AAR"), screening for evaluation of upper extremity and low back cumulative trauma disorders, the impact and biomechanics of walking on railroad ballast, ergonomic investigation and biomechanical analysis of hand switch/hand brake operation, AAR studies on shock and vibration in railroad equipment and boxcars, an ergonomic study related to whole body vibration in railroad locomotives, a study on railroad yard worker safety by the U.S. Dept. of Commerce, and standards from organizations such as NIOSH, OSHA, the American Railway Engineering and Maintenance of Way Association, and the American Railway Engineering Association. Kress has also written a publication for the National Safety Council addressing overuse injuries and railroad work.

The Court finds that Kress' expert opinions rise above "subjective belief and unsupported speculation" and will assist the trier of fact in understanding the evidence, as

well as facts in issue.  It should therefore not be stricken.  *See* Target Market Publishing v. Advo, Inc., 136 F.3d 1139, 1143 (7ᵗʰ Cir. 1998), *citing* General Electric Co. v. Joiner, 522 U.S. 136 (1997).  The nature of some of the factual bases for Kress' opinion, application of scientific literature/studies to Kelly's situation, or alleged failure to take other causes of Kelly's injuries into consideration could serve as a basis for Illinois Central to challenge the weight of his opinion, but are not a sufficient reason to bar his testimony.  *See* Commonwealth Insurance Co. v. Titan Tire Corp., 2005 WL 3479031, at *1 (C.D.Ill. Dec. 20, 2005), *citing* Sikora v. AFD Industries, Inc., 319 F.Supp.2d 872, 879 (N.D>Ill. 2004). Accordingly, the Motion to Bar the Expert Opinion Testimony of Tyler Kress is denied.[2]

## IV.  **Expert Causation Opinions by Treating Physicians and Causation Evidence**

FELA is not a strict liability statute, but rather requires an employee to prove the traditional elements of a common law negligence claim: duty, breach, foreseeability, and causation.  Williams v. National R.R. Passenger Corp., 161 F.3d 1058, 1062 (7ᵗʰ Cir. 1998). It is the fourth element of proof (i.e., causation) that is at issue in this Motion.

Illinois Central maintains that the causation opinions offered by Kelly's treating physicians, Dr. S.K. Velu, Dr. George Schoedinger, Dr. Forbes McMullin, Stephanie Culver, DC, and Dr. Jeffrey Harms, are insufficient under Rule 702 and Daubert and must be barred. Kelly concedes that Dr. Velu, Dr. Harms, and Dr. Culver will not be offering causation opinions.  Accordingly, it is only the opinions of Dr. Schoedinger and Dr. McMullin

---

[2] Illinois Central's Motion also contains an argument to bar a certain portion of Kress' testimony with regard to locomotive seat design as preempted by federal law.  As this argument is addressed in the separate Motion for Partial Summary Judgment on Plaintiff's Allegations Regarding Locomotive Seats, it will be addressed there rather than in the context of the Motion to Bar.

that remain at issue.  Illinois Central does not challenge either physicians' qualifications, but rather the methodologies they used to reach their conclusions as to the causation of Kelly's injuries.  Treating physicians are treated the same way as other experts when attempting to offer expert opinions regarding causation.  O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1105 n.14 (7th Cir . 1994).

Dr. Schoedinger is a board certified orthopedic surgeon specializing in the treatment of the spine.  His treatment of Kelly began on August 22, 2006.  Kelly told him that he had worked on the railroad as a brakeman/conductor for 30 years and had sustained a lumbar disc rupture in his lower back after walking quickly on ballast and stepping into a hole after pulling the pin on a flat car while working in 1990.  (Schoedinger Dep., at 5-6)  However, Dr. Schoedinger did not see any of the records from his treatment at that time or any of the films that were taken; he relied on the information provided to him by Kelly.  Id.  Kelly also told him that he had experienced back and neck stiffness ever since that injury.  Id., at 6-7.  Dr. Schoedinger did not see any records from Kelly's treatment with Dr. Culver at the Clinton Chiropractic Center.  Id., at 7.  Kelly advised that he was a smoker and that he also golfed.  Id.

Dr. Schoedinger did a physical exam and examined x-rays before diagnosing Kelly with aggravated degenerative cervical and lumbar disc disease.  Id., at 8.  He recommended that Kelly undergo an MRI and discontinue his employment for the railroad. Id.  The MRI revealed disc ruptures at three levels in his cervical spine and disc protusions at L3 to S1.  Id., at 9.  When Dr. Schoedinger saw him again in February 2008, Kelly complained of escalated pain in his lower back.  Id., at 10.  His recommendation was that Kelly lose weight and exercise.  Id., at 11.  Other than the examination, review of x-rays,

and MRI, Dr. Schoedinger has not provided any other treatment for Kelly.  Id., at 11-12. He does not know how long the disc ruptures or protrusions had existed or if they were present in 1990 when Kelly had his work-related injury in 1990.  Id., at 12.

Dr. Schoedinger then testified that underlying the disc protrusions or ruptures, Kelly had degenerative disc disease, but admitted that all adults had it to some degree.  Id., at 13.  He is unable to quantify the degree of his degenerative disc disease that would be attributable to his age or factors other than his work activities.  Id.  He is not able to rule out what role Kelly's 1990 back injury may have played in the development of the disc ruptures that he observed.  Id., at 14.  "It may very well be that there were multiple lesions or just a single lesion, but if there were a single lesion and that is the cause of his current difficulties then his – the episodes of work and other activities of his life have caused an aggravation of that difficulty."  Id.

Dr. Schoedinger was unfamiliar with the geographic area where Kelly worked, what facilities he worked at, how much time he spent on trains versus doing job duties off the trains, what type of trains he worked on, what types of job duties that he performed when he was not on trains, any other traumatic injuries he may have sustained other than the back injury in 1990, particular work activity that Kelly associated with his back or neck problems, forces involved on the cervical or lumbar spine in any of the work activities he performed, or how he did his work.  Id., at 15-16.  He has not seen results of tests measuring the forces on the back or neck of a railroad conductor or the time spent doing particular activities and was not provided with any description of Kelly's work activities.  Id., at 17.  Although Dr. Schoedinger thinks there is work out there suggesting that people who are exposed to repetitive stresses will develop degenerative changes at a more rapid rate

than others, he has not seen any literature or studies directed toward railroad conductors or which associate the type of work that conductors do with the type of lumbar spine injuries that Kelly has sustained. Id., at 17-18. Nor has he attempted to compare the forces on Kelly's spine resulting from his work on the railroad as opposed to any other life activity such as golf. Id., at 18.

That being said, Dr. Schoedinger testified that he bases his opinions on his treatment of more than 100 railroad conductors over the years for traumatic and cumulative trauma injuries. Id., at 19. He has read some literature published by a Dr. Eckardt Johanning regarding people such as engineers and conductors who are subjected to vibration while riding on trains that has been subjected to peer review. Id. However, Dr. Schoedinger did not indicate that he relied on these publications in opining at least part of Kelly's spine problems are work related. Id., at 19-20. Rather, he relied on his years of treating railroad conductors for his opinion that at least a portion of conductors' "job related activities contributes to the wear and tear changes that one sees in their necks and backs," and explained that this made it unnecessary for him to see any specific studies regarding the forces applied to railroad employees to render his opinion. Id., at 20.

Dr. Schoedinger then admitted that he could not specify a percentage of railroad conductors who have cervical or lumbar spine problems versus individuals employed in any other profession and had treated patients suffering from cervical or lumbar spine problems who were engaged in light or medium duty work as well. Id., at 21-22. Discs can rupture with light or medium duty work and also as a result of a particular traumatic injury. Id., at 22.

While the Court rejects Illinois Central's suggestion that Dr. Schoedinger necessarily had to employ some kind of testable or repeatable method in order to render an expert opinion of causation, Rule 702 requires that his opinion be based upon sufficient facts or data, and the above review of the record reveals that this factual foundation was woefully inadequate in this case.  Dr. Schoedinger admittedly knew very little about Kelly's job duties, specific working conditions, or activities outside of work that could have factored into his analysis.  Nor could he identify how much of Kelly's condition could be attributed to his prior injury, for which Kelly had already been compensated, because he never bothered to examine those medical records for purposes of comparison.  Rather, it would appear that his opinions were little more than assumptions based on his treatment of other railroad employees in the past.  It is unclear from his testimony how much he actually knew about what is required of a railroad conductor in general, let alone what had been required of Kelly in particular.  Sowell v. Burlington N. & Santa Fe Ry. Co., 2004 WL 2812090, at *5 (N.D.Ill. 2004) (noting that the treating physician had not indicated how he knew what was required of a railroad engineer or conductor.)  Moreover, if his knowledge of the factual background concerning the hundreds of other railroad employees that he has treated over the years was as lacking and cursory as the factual background that he had in this case, then his reliance on his years of treatment in forming his opinions would be utterly lacking in any reasonable foundation.  While Dr. Schoedinger may in fact have an adequate factual knowledge of the  job functions of and stresses inherent in the position of a railroad conductor from sources other than Kelly, such evidence is simply not present in the record before the Court.

Accordingly, the Court must conclude at this time that the expert causation opinions that Kelly wishes to introduce though Dr. Schoedinger are lacking a sufficient factual basis, which consequently undermines the reliability of the principles or methods upon which his testimony is based. The Court therefore finds that Dr. Schoedinger's causation opinions are insufficiently reliable to be admissible under Rule 702 and <u>Daubert</u>, and Illinois Central's Motion to Bar such opinions is granted in this respect. If Kelly can provide an offer of proof establishing that Dr. Schoedinger has an adequate factual knowledge of the subjects found to be deficient, the Court may be willing to reconsider its ruling.

Dr. McMullin is a board certified orthopedic surgeon specializing in treating knees and hips. (McMullin Dep., at 4) His treatment of Kelly began on September 12, 2006, when Kelly came to see him complaining of bilateral knee and right hip pain. <u>Id.</u>, at 5. After performing a physical exam and reviewing x-rays, Dr. McMullin ordered an MRI to confirm his initial assessment that Kelly had bilateral knee chondromalacia of the patella with possible meniscal tears. <u>Id.</u>, at 8-9. His hip x-ray was essentially normal and never necessitated treatment from Dr. McMullin. <u>Id.</u>, at 9-10. Kelly's knee problems required arthroscopic surgery on November 1, 2006. <u>Id.</u>, at 11.

Kelly advised him that he worked as a brakeman/conductor for the railroad but did not tell him where he worked geographically, how much time he spent on trains versus off trains, describe any particular facilities or yards he worked in, anything about the particular models of trains he worked on, what types of activities he did on the job when not on the train, or what activities he engaged in outside of work. <u>Id.</u>, at 5-6, 19. Although Kelly generally inferred that his injury was the result of the type of heavy labor he had been doing over the years as a conductor, he did not identify or associate his pain with any particular

work activity, indicate how much he had to squat, kneel, climb, or walk on ballast, or provide any records attempting to describe what he did as a railroad employee.  Id., at 6, 15.  Dr. McMullin knew from Dr. Schoedinger's notes that Kelly had to walk on ballast, pull pins, and do things like that, but did not have any idea with what frequency he had to perform these tasks or how someone in Kelly's position actually performed his work.  Id., at 7, 15-16.  He could not quantify the amount of time that Kelly spent doing particular tasks on the job or the forces on his knees from doing a particular job activity.  Id., at 18.

Dr. McMullin may have seen some job descriptions over the years, but could not recall them at the time.  Id., at 16.  He had not seen the results of any studies determining how brakemen/conductors do their particular job activities in a given day, week, or month or which have shown an association between the requirements of the job and the development of chondromalacia of the patella.  Id., at 16-17.  Over the years in his practice, he has treated people working for the railroads who develop these types of problems, which he relates to overuse syndrome.  Id., at 17.  However, he has not personally observed how they do their work or reviewed the works of others who have gone out and observed how they do their work.  Id.  Dr. McMullin could not identify any literature that would set forth the number of repetitions of any particular activity performed by railroad conductors that would be necessary to develop chondromalacia of the patella or any epidemiological studies addressing the occupation of a brakeman/conductor and the likelihood of such persons developing chondromalacia of the patella.  Id., at 18.  He was likewise unaware of the distance Kelly had to step up or down to get on or off the train or any studies connecting getting on and off railroad equipment with the development of chondromalacia of the patella.  Id., at 22-23.  Nor did  he attempt to do any comparison of the forces on Kelly's

knees from work activities versus activities that he may have engaged in outside of his job. Id., at 19-20.

Dr. McMullin admitted the fact that things such as trauma, the aging process, weight, heredity, infection, family history of arthritis, and the presence of another connective tissue disease can all play a role in the development of chondromalacia of the patella. Id., at 19-21. However, with the exception of weight, it does not appear that he had the factual basis to evaluate the application of these factors to Kelly's situation.

Again, the Court rejects Illinois Central's argument that Dr. McMullin's testimony must necessarily fail for lack of case-specific testing or measurement, yet like the opinions of Dr. Schoedinger, his opinions regarding causation are unreliable for the same lack of factual foundation and must be excluded for the reasons set forth above. The record before the Court simply does not indicate that he had a sufficient factual understanding of Kelly's (or any other railroad conductor's) work-related duties or activities outside of work to have an adequate factual basis for reaching his conclusions. As with Dr. Schoedinger, Kelly has failed to create a record that would support the reasonable conclusion that his opinions were more than assumptions based on his treatment of other railroad employees in the past. Absent some evidence that his past treatment had provided him with more detailed knowledge as to what is required of a railroad conductor in general, his reliance on his years of treatment in forming his opinions would also be utterly lacking in any reasonable foundation. *See,* Sowell, 2004 WL 2812090, at *5 (N.D.Ill. 2004). Thus, the lack of sufficient facts to substantiate his opinions undermines the reliability of Dr. McMullin's principles and methods to the point that the Court cannot allow the causation testimony under Rule 702 or Daubert. Illinois Central's Motion to Bar is also granted with

respect to Dr. McMullin's causation opinions.  Again, however, if Kelly can provide an offer of proof establishing that Dr. McMullin has an adequate factual knowledge of the  subjects found to be deficient, the Court may be willing to reconsider its ruling.

Finally, Illinois Central moves for summary judgment on the ground that none of Kelly's proffered causation evidence is either proper or sufficient, requiring the entry of summary judgment in its favor on his FELA claim.  Under FELA, employers have a duty to provide employees with a reasonably safe workplace, and "[t]he language of the statute is broad, covering any injury sustained by a railroad employee if that injury was caused 'in whole or in part from the negligence' of the carrier."  <u>Grogg</u>, ___ F.Supp.2d ___, 2009 WL 2970380, at *2.  FELA employs a relaxed standard for causation.  An employee need not prove that the carrier's negligence was the sole cause of the injury, only that the negligence played "any part, even the slightest, in producing the injury for which the plaintiff seeks recovery."  <u>Id.</u>, *citing* <u>Rogers v. Missouri Pacific R.R. Co.</u>, 352 U.S. 500, 506-07 (1957).

In support of its Motion for Summary Judgment for Lack of Causation Evidence, Illinois Central relies on <u>Lisek v. Norfolk & Western Ry. Co.</u>, 30 F.3d 823, 832 (7th Cir. 1994), for the proposition that "[i]f the plaintiff presents no evidence whatsoever to support the inference of negligence, the railroad's summary judgment motion is properly granted." It then cites  <u>Walden v. Illinois Central Gulf R.R.</u>, 975 F.2d 361 (7th Cir. 1932), for the holding that where a plaintiff fails to produce any reliable evidence of causation, his claim must fail.  The Court does not disagree with these propositions of law, but finds that they are factually inapplicable in this case, as Illinois Central's argument erroneously assumes the exclusion of all expert testimony in this regard.

The Court has now excluded the causation opinions of Drs. Schoedinger and McMullin, but granted leave to seek reconsideration via an appropriate offer of proof in the event that the doctors have additional knowledge from their years of treating railroad employees that was not reflected in their opinions or depositions. The other evidence regarding causation comes from the testimony of Kress, and the Court has declined Illinois Central's request to summarily exclude his testimony. Even assuming that no adequate offer of proof is presented, Drs. Schoedinger and McMullin are Kelly's treating physicians and may present testimony regarding the nature and extent of Kelly's injuries. The Court's finding barring them from giving the ultimate opinion that his injuries were caused by his work for the railroad does not prevent them from giving testimony based on their experience and training as to what kinds of motions or conditions are known in the medical field to cause such injuries in a general sense. Kress may then be able to provide the link to the actual job duties performed by Kelly for the railroad to allow the jury to draw the inference that his work for the railroad was at least one cause of his injuries. Whether the jury will ultimately be persuaded to draw this inference is far from clear, but the fact that it could reasonably be drawn precludes the entry of summary judgment requested by Illinois Central.

### V.     Locomotive Seats

Illinois Central moves for the entry of summary judgment on Kelly's claims regarding locomotive seat design, specifically that the seats had inadequate shock absorption, were hard, and had seat backs which were not tall enough. Illinois Central asserts that these claims regarding locomotive seat design are precluded by the Locomotive Inspection Act ("LIA"), 49 U.S.C. 20701, and regulations promulgated thereunder by the FRA. Although

one federal statute cannot technically preempt another, two statutes addressing the same subject matter may result in one statute implicitly repealing the other, which implicates a type of preclusion analysis. Grogg, ___ F.Supp.2d ___, 2009 WL 2970380, at *12, *citing* Rahdolph v. IMBS, Inc., 368 F.3d 685, 688 (7th Cir. 2004), Becraft v. Norfolk Southern Ry. Co., 2009 WL 1605293, at *1 (N.D.Ind. June 5, 2009). The degree to which preclusion by the LIA or FRSA applies to bar FELA claims is a developing subject in the law, "and there is clearly no bright line test for applying preclusion . . . [which] must still be applied on a case by case, claim by claim basis." Grogg, ___ F.Supp.2d ___, 2009 WL 2970380, at *13.

The LIA was enacted to supplement FELA to facilitate employee recovery. *See* Urie, 337 U.S. at 189. A rail carrier's violation of the LIA is negligence per se under FELA and subjects the carrier to strict liability. Coffee v. Northeast Illinois Regional Commuter R. Corp., 479 F.3d 472, 477 (7th Cir. 2007); McGinn v. Burlington Northern R.R. Co., 102 F.3d 295, 298-99 (7th Cir. 1996).

The LIA requires railroads to equip locomotives with certain equipment. Id. It "extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 611 (1926). "Parts" and "appurtenances" have then been defined as encompassing "[w]hatever in fact is an integral or essential part of a completed locomotive, and all parts or attachments definitely prescribed by lawful order of the [Secretary of Transportation], are within the statute." Southern Ry. Co. v. Lunsford, 297 U.S. 398, 402 (1936).

Kelly has admitted that "a locomotive cab seat is an appurtenance of a locomotive under the LIA." *See* 49 C.F.R. § 229.119(a). However, the regulation in question provides simply that, "Cab seats shall be securely mounted and braced." 49 C.F.R. § 229.119(a).

Kelly does not argue that the seats were not securely mounted or braced, but rather that they had inadequate shock absorption, were hard, and had seat backs which were not tall enough, none of which are discussed in the regulation. As set forth by Judge Simon in Becraft:

> I can safely assume that where the issue raised by a FELA claim is directly covered by a regulation issued pursuant to the LIA, then the claim is precluded. I make this assumption based on the similar conclusion made by the Seventh Circuit in *Waymire v. Norfolk and Western Ry. Co.*, 218 F.3d 773, 776-77 (7th Cir. 2000) with respect to FELA claims and the Federal Railroad Safety Act ("FRSA"). . . . The *Waymire* court took the well developed history of FRSA/state law preemption cases, and reasoned that the FELA claims should be similarly precluded if they are "inconsistent."
>
> * * *
>
> *Terrell* [*v. Soo Line R.R. Co.*, 2005 WL 4882750 (S.D.Ind. Sept. 1, 2005)] represents a recent example within this circuit of a court recognizing the limitations of the LIA's preclusive effect against potential FELA claims. In *Terrell*, the plaintiff claimed his injuries stemmed from locomotive seats that were unsafe because of inadequate air cushioning. Judge Tinder found the employee's FELA claim was not superceded by the LIA, despite the fact that the defendant had complied with regulations regarding the secure mounting and bracing of cab seats. Judge Tinder noted that "even if Defendant did not violate the LIA or its regulations, this does not preclude a finding of liability under the FELA. Interpreting *Waymire* and other preemption cases to allow FELA claims so long as they are not inconsistent with existing FRA regulations, he found the LIA did not address seat cushioning and that the FELA claim could therefore move forward.
>
> * * *
>
> In this sense, the LIA serves its originally intended function as a "supplement" to FELA, not a replacement.

2009 WL 1605293, at *3-6 (internal citations omitted.)

This analysis was adopted in <u>Grogg</u>, and the Court finds it persuasive in this case despite district court opinions in different circuits holding to the contrary. *See, e.g.,* <u>Munns v. CSX Transp., Inc.</u>, 2009 WL 805133 (N.D.Ohio March 27, 2009); <u>Munns v. CSX Transp., Inc.</u>, 579 F.Supp.2d 924 (N.D.Ohio 2008); <u>Kansas City Southern Ry. Co. v. Nichols Const. Co., LLC</u>, 574 F.Supp.2d 590 (E.D.La. 2008); <u>Tucker v. BNSF Ry. Co.</u>, 2008 WL 3286748 (E.D.Cal. Aug. 6, 2008). For the reasons expressed in <u>Grogg</u>, <u>Terrell</u>, and <u>Becraft</u>, the Court declines Illinois Central's request to apply the preclusion doctrine to bar Kelly's seat design claims. The Motion for Summary Judgment on Plaintiff's Allegations Regarding Locomotive Seats is denied based on the preemption argument.

Aside from the locomotive seat claim, Illinois Central further argues that any other LIA claim hypothetically presented in Count III of the Complaint should be dismissed for failure to specify or introduce evidence establishing that any specific FRA regulation was violated or that any other part or appurtenance was not kept in proper and safe condition. Illinois Central's argument is perfunctory, undeveloped, and fails to acknowledge evidence in the record, as noted in Kelly's response to the Motion. Whether Kelly is able to sufficiently persuade a jury regarding his claims is again far from clear, but that is not the issue at summary judgment. The Court finds that Kelly has, by the barest of margins, submitted enough evidence to raise a genuine issue of material fact as to whether Illinois Central violated 49 C.F.R. §§ 229.7 and 229.45, and summary judgment is denied in this respect as well.

**CONCLUSION**

For the reasons set forth herein, Illinois Central's Motion for Summary Judgment on the Statute of Limitations [#17] is DENIED. The Motion for Partial Summary Judgment

Regarding Ballast Claims [#20] is DENIED.  The Motion to Bar the Expert Opinion Testimony of Tyler Kress [#29] is DENIED.  The Motion to Bar Plaintiff's Treating Physicians From Giving Expert Causation Opinions [#18] is GRANTED with leave to seek reconsideration after an adequate offer of proof, to be filed no later than 5:00 pm on the day before the Final Pretrial Conference.  The Motion for Summary Judgment for Lack of Causation Evidence [#40] is DENIED.  The Motion for Partial Summary Judgment on Plaintiff's Allegations Regarding Locomotive Seats [#38] is DENIED.

ENTERED this 12th day of January, 2010.


s/ Michael M. Mihm_____
Michael M. Mihm
United States District Judge